# Supreme Court of Florida

_____

No. SC2022-1671

_____

**STATE OF FLORIDA,**

Appellant/Cross-Appellee,

vs.

**LEO LOUIS KACZMAR, III,**

Appellee/Cross-Appellant.

_____

No. SC2023-0725

_____

**LEO LOUIS KACZMAR, III,**

Petitioner,

vs.

**SECRETARY, DEPARTMENT OF CORRECTIONS,**

Respondent.

February 19, 2026

GROSSHANS, J.

The parties in this postconviction case appeal the circuit court's order that vacated Leo Louis Kaczmar, III's death sentence

but upheld his first-degree murder conviction.[1]  For the reasons given below, we reverse the grant of penalty-phase relief.  We affirm in all other respects.  We also deny Kaczmar's petition for habeas corpus relief.

I

One December morning in 2008, Eva Mitchell and her husband observed a home on fire in Green Cove Springs, Florida. Eva called 911, while her husband ran up to the home, kicked open the back door, and shouted to determine if anyone was inside.  No one responded.

Law enforcement and firefighters soon arrived at the home. They learned that in the days leading up to the fire, the home had been occupied by Kaczmar, his wife and children, his uncle, and his father's girlfriend—Maria Ruiz.  Once the fire was contained, law enforcement located a burned and bloodied body near the kitchen. The officers would soon discover it was the body of Maria Ruiz.

This discovery gave rise to an investigation, with canvassing efforts being one of the initial steps.  From discussions with a

---

1.  We have jurisdiction.  *See* art. V, § 3(b)(1), (9), Fla. Const.

neighbor—Julia Ferrell—law enforcement learned that a heated argument had occurred at the Kaczmar home in the early morning hours before the fire. Ferrell indicated that Kaczmar's voice was discernable during the argument.

Meanwhile, a fire investigator took steps to determine the cause and origin of the fire. To this end, the investigator identified and collected six areas of fire debris, five of which would later test positive for the presence of gasoline.

As the initial investigation was taking shape, Kaczmar's wife Priscilla arrived at the home and called Kaczmar.[2] During the conversation, she passed the phone to Officer John Parker who asked Kaczmar to come to the home. Kaczmar complied.

Upon arriving at the home, Kaczmar showed Officer Parker a receipt indicating that Kaczmar had purchased gas that morning near Jacksonville. Kaczmar told Officer Parker that he had been fishing in the Jacksonville area.

Later that day, officers asked that Kaczmar report to a nearby police station in order to discuss matters relating to the fire and the

---

2. Priscilla and her two children spent the previous night with relatives.

discovery of Ruiz's body. Kaczmar agreed and was driven to the station by his mother and stepfather. At the outset of the interview, Detective Charlie Sharman advised Kaczmar of his constitutional rights, which Kaczmar acknowledged by signing a form.[3]

In the exchange that followed, Kaczmar generally denied involvement in the arson and other wrongdoing. Although he repeated his earlier story that he had been fishing in Jacksonville, he acknowledged being alone in the home with Ruiz from roughly 11:00 p.m. to 2:00 a.m.—just hours before the fire.

Midway through the interview, Detective Sharman pressed Kaczmar about some of his injuries and the condition of his clothing. Kaczmar responded that he wanted an attorney if that line of questioning continued. However, Kaczmar promptly reengaged Detective Sharman in discussion. In response, Detective Sharman reminded Kaczmar that he had the right to a lawyer during the interview. Not invoking that right, Kaczmar returned to talking about matters pertaining to the active police investigation.

---

3. *See Miranda v. Arizona,* 384 U.S. 436, 467 (1966) (requiring police to advise suspects in custody of certain things—including the right to silence and the presence of a lawyer—prior to interrogation).

Kaczmar ultimately left certain articles of clothing at the station, including a sock that he smeared his own blood on during a break in the interview.

Weeks later, after law enforcement uncovered more evidence implicating Kaczmar (including that he purchased a small amount of gasoline from a nearby gas station moments before the fire was observed), a grand jury indicted him on charges of first-degree murder, attempted sexual battery, and arson. The State gave notice that it sought the death penalty for the murder.

Meanwhile, Kaczmar's post-indictment conduct and conversations were brought to the prosecutor's attention and became sources of evidence at trial. After his arrest, Kaczmar was confined in the Clay County Jail, where he spent significant time with William Filancia, a fellow inmate who was frequently housed with Kaczmar. At some point after Kaczmar started talking about his case, Filancia reached out to his attorney, Richard Kuritz. Kuritz, in turn, spoke with the prosecutor and Detective Sharman, setting up a meeting with them.

Eventually, Detective Sharman enlisted the services of an undercover officer, Detective Charles Humphrey, who agreed to

portray himself as "Carlos," a friend of Filancia. Detective Sharman gave Detective Humphrey a map that Kaczmar had drawn, which showed the way to Christopher Ryan Modlin's home.[4] Soon after being given the map, Detective Humphrey began visiting Kaczmar at the jail. During the four visits, the two discussed (1) putting gasoline-soaked clothes at or under Modlin's home in an effort to frame him, (2) intimidating witnesses to come forward in support of Kaczmar, and (3) arranging to have Kaczmar's wife Priscilla pay "Carlos" $300 for these purported services.

Several months after Detective Humphrey's last jail visit, Kaczmar's case went to trial. The State called numerous witnesses, including the medical examiner (Dr. Jesse Giles), two DNA experts, Julia Ferrell, Kaczmar's wife, Detectives Sharman and Humphrey, and a fire investigator and analyst. Additionally, the State presented physical evidence tying Kaczmar to the crime scene. This included photographic and video evidence showing Kaczmar purchasing gasoline minutes before the fire. The State also played recordings of Kaczmar's interview with Detective Sharman and

---

4. Modlin lived near the Kaczmar home and spent time with Kaczmar the day before the murder.

three of his conversations with Detective Humphrey. Following the State's case, Kaczmar asked for a judgment of acquittal on all charges, which the trial court denied.

As for the defense case, Kaczmar's counsel called one witness, Detective Michael Goldner, who testified about his search of Kaczmar's truck. According to the detective, he observed nondescript stains and collected evidence of them. But neither he nor other law enforcement sought to have the stain-related evidence tested.

Ultimately, the jury found Kaczmar guilty on all charges. And following the penalty phase, it recommended a sentence of death by a vote of 11 to 1. Accepting that recommendation, the court sentenced Kaczmar to death.

Kaczmar appealed, raising nine issues for our review. *See Kaczmar v. State* (*Kaczmar I*), 104 So. 3d 990, 998 (Fla. 2012). We concluded that he had failed to show reversible error in connection with his first-degree murder conviction. *Id.* at 998-1006. But as for the penalty phase, we found that the State had not proven three of the four aggravators and determined that such error was not harmless. *Id.* at 1007-08. Consequently, we reversed

Kaczmar's death sentence, remanding for a new penalty phase. *Id.* at 1008.

On remand, Kaczmar waived his right to present mitigation, doing so against his counsel's advice. *See Kaczmar v. State* (*Kaczmar II*), 228 So. 3d 1, 6 (Fla. 2017). Prior to jury selection, the trial court gave the following preliminary statement to the jury pool:

> Good morning, ladies and gentlemen. My name is William Wilkes, and I'm the Judge that will be handling this case.
>
> This case has a little history to it so let me explain your duty today. It's different than most trials we ever have.
>
> The defendant was found guilty of murder in the first degree on 8/12/10, sentenced on 11/5/10 *to life -- to death in this case.* Anyway, the Supreme Court always reviews any type of death case so the case went to the state Supreme Court, Florida State Supreme Court. They affirmed his conviction, that is they confirmed his conviction for the first-degree murder. However, the Supreme Court sent the case back here with instructions that the defendant is to have a new trial to decide what sentence should be imposed.

(Emphasis added.)

No one objected to this statement.

Later, during the evidentiary portion of the proceeding, the State presented evidence in support of two aggravating

- 8 -

circumstances. To prove the prior-violent-felony (PVF) aggravator, the prosecutor relied on the following stipulation to the jury:

> [T]he robbery the defendant was convicted of involved the defendant and a co-defendant. The defendant and co-defendant repeatedly struck and kicked the victim about the head and then forcefully took his jewelry and wallet for themselves against the victim's will. The defendant was 17 years of age at the time of the offense . . . but was charged and sentenced as an adult.

As for the other aggravator, the prosecutor presented testimony from the medical examiner, Dr. Giles, to show that the murder was especially heinous, atrocious, or cruel (HAC). According to Dr. Giles, Ruiz was stabbed roughly 93 times, including 11 fatal stab wounds. In addition to this evidence, the prosecutor reintroduced the former testimony of ten guilt-phase witnesses. This included the testimony of Filancia and his lawyer, Richard Kuritz.

As for mitigation, Kaczmar read a stipulation indicating that he was 24 years old when Ruiz was murdered. He offered no other mitigating evidence.

Following closing arguments, the judge instructed the jury on the law. In part, the judge told the jury that (1) "[a]n Appellate Court has reviewed and affirmed the defendant's conviction [but]

. . . sent the case back to this Court with the instruction that the defendant is to have a new trial to decide what sentence should be imposed," (2) it should not concern itself with Kaczmar's guilt, (3) its recommendation must be based on the evidence received during that penalty-phase proceeding, and (4) it must follow the law as given in the jury instructions.

During deliberations, the jury asked four fact-based questions. Outside the jury's presence, the prosecutor and defense counsel both urged the court not to resolve the factual issues framed by these questions. Agreeing with the parties, the court told the jury that its questions were "not relevant" and could not be answered.

The jury ultimately recommended death by a unanimous vote. Later, following a *Spencer*[5] hearing, the trial court again sentenced Kaczmar to death. In its written order, the court found that the State proved the HAC and PVF aggravators beyond a reasonable doubt. It further determined that these aggravators "far outweigh[ed]" the 15 record-supported mitigating circumstances.

Kaczmar appealed, arguing in part that (1) the prosecutor, in

---

5. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

closing argument, improperly referred to mitigation as "excuses," (2) the trial court committed error in telling the jury that its mid-deliberation questions were not relevant, and (3) his death sentence violated *Hurst v. Florida*, 577 U.S. 92 (2016), and *Hurst v. State*, 202 So. 3d 40 (Fla. 2016) (on remand). *See Kaczmar II*, 228 So. 3d at 7-9, 11-12. We ultimately denied all relief and affirmed Kaczmar's death sentence. *Id.* at 9-11, 12-15.

Kaczmar sought rehearing, arguing for the first time that he was entitled to a new penalty phase based on the judge's statement to the jury pool about his vacated death sentence. *Kaczmar v. State*, 42 Fla. L. Weekly S851, S851 (Fla. Oct. 19, 2017) (unreported order). Not reaching the merits of this argument, we denied relief without prejudice to Kaczmar's right to raise it in a separate habeas proceeding. *Id.* Two justices, though, would have granted relief. *Id.* at S851-52 (Pariente, J., dissenting); *id.* at S852 (Quince, J., dissenting).

Unsuccessful in challenging his death sentence, Kaczmar then turned to the U.S. Supreme Court, which denied his petition for certiorari over one justice's dissent. *Kaczmar v. Florida*, 585 U.S. 1011, 1011 (2018); *id.* (Sotomayor, J., dissenting).

Following this, Kaczmar filed a postconviction motion in circuit court, asking that his first-degree murder conviction and death sentence be vacated. Ultimately, Kaczmar presented 29 numbered claims and multiple subclaims. Kaczmar asserted numerous instances of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984). He also claimed violations of due process, relying on the U.S. Supreme Court's decisions in *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and *Napue v. Illinois*, 360 U.S. 264 (1959). Finally, Kaczmar argued entitlement to relief based on cumulative error in the guilt and penalty phases.

Following a case-management hearing, the circuit court ruled that all but eight claims would be decided at an evidentiary hearing. At that hearing, postconviction counsel called 13 witnesses, including both of Kaczmar's defense lawyers, the prosecutor, a DNA expert, and Kaczmar himself. The State, for its part, called one witness—a DNA expert.

Ultimately, the circuit court vacated Kaczmar's death sentence, finding merit in connection with one of his penalty-phase ineffectiveness claims. According to the circuit court, trial counsel

was deficient for not objecting to the circuit court's statement that Kaczmar had previously been sentenced to death. That deficiency, in the circuit court's view, prejudiced Kaczmar. The circuit court denied relief as to all other claims.

These rulings are set forth in the order that both parties now appeal. The State challenges the circuit court's finding of one instance of ineffective assistance of counsel, which provided the only given basis for vacating Kaczmar's death sentence. Kaczmar, on the other hand, challenges the denial of virtually all his unsuccessful claims. Beyond this, Kaczmar raises a number of additional claims by way of a habeas petition, which he filed concurrently with his initial brief. Our analysis is divided into three sections, starting with the State's appeal and ending with Kaczmar's habeas petition.

## II

The State's appeal focuses on the circuit court's grant of one claim of ineffective assistance of counsel, which depends on a showing of deficient performance and prejudice. The circuit court found both. The State all but concedes deficient performance in defense counsel's failure to object to the judge's comment on

Kaczmar's earlier vacated death sentence. However, the State asks us to reverse on no-prejudice grounds. Though we do not entirely accept the State's sweeping arguments in this regard, we agree that Kaczmar was not prejudiced by the circuit court's passing remark about Kaczmar's prior death sentence.

### A

We begin by discussing background legal principles. Under U.S. Supreme Court precedent interpreting the Sixth Amendment, a defendant has the right to the effective assistance of counsel. *Strickland*, 466 U.S. at 686. This right applies in both guilt and penalty phases. *See, e.g.*, *Jackson v. State*, 347 So. 3d 292, 302 (Fla. 2022) (guilt phase); *State v. Mullens*, 352 So. 3d 1229, 1236-37 (Fla. 2022) (penalty phase). To successfully claim a breach of this right, the defendant must show two things: deficient performance and prejudice. *Truehill v. State*, 358 So. 3d 1167, 1175 (Fla. 2022).

The deficient-performance prong focuses on the reasonableness of counsel's conduct. *Strickland*, 466 U.S. at 688. To be reasonable, counsel need not be perfect; nor must counsel adhere to the best or most common practices. *See Harrington v. Richter*, 562 U.S. 86, 105 (2011); *Premo v. Moore*, 562 U.S. 115, 122

(2011). Rather, counsel's conduct is judged against a minimum standard of objective reasonableness—a standard informed by all the circumstances at the time counsel made the challenged decision. *Strickland*, 466 U.S. at 688. Accordingly, it is only when no reasonable lawyer would act as defense counsel did that a finding of deficient performance is appropriate. *Jackson*, 347 So. 3d at 304; *cf. Harrington*, 562 U.S. at 104 (underscoring "the 'wide range' of reasonable professional assistance" (quoting *Strickland*, 466 U.S. at 689)). A corollary to this rule is that reasonable strategic decisions do not amount to deficient performance. *Sheppard v. State*, 338 So. 3d 803, 816 (Fla. 2022).

In light of these principles, it is not surprising that the U.S. Supreme Court has characterized review of counsel's conduct as being "highly deferential." *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (quoting *Strickland*, 466 U.S. at 689). And consistent with Supreme Court case law, we have recognized that the defendant bears the burden of showing that counsel's performance was deficient. *Jackson*, 347 So. 3d at 301 & n.6.

Even if a defendant can clear the "high bar" of showing deficient performance, *see Cullen v. Pinholster*, 563 U.S. 170, 197

(2011) (quoting *Harrington*, 562 U.S. at 105), he must still demonstrate prejudice in order to be entitled to relief, *see Strickland*, 466 U.S. at 692. The prejudice inquiry focuses on the effect of counsel's conduct. *Id.* at 694. In the penalty-phase context, the defendant must show a reasonable probability that the sentencer would have imposed a lesser sanction, taking into account the entirety of the record. *See Mullens*, 352 So. 3d at 1242. Thus, as with the deficiency prong, the defendant has the burden to show prejudice. *See Cullen*, 563 U.S. at 189.

These principles inform our standard for assessing rulings on ineffectiveness claims. We review a circuit court's factual findings for competent, substantial evidence. *Truehill*, 358 So. 3d at 1175. Nevertheless, we review the application of law to facts and the court's ultimate conclusions under the de novo standard. *Id.* Accordingly, "[o]ur deference to supported factual findings does not extend to the postconviction court's ultimate conclusions on the deficient performance and prejudice prongs." *Mullens*, 352 So. 3d at 1238 (citing *King v. State*, 260 So. 3d 985, 994 (Fla. 2018)).

B

Before applying these principles, we note our acceptance of two premises.  One, we credit Kaczmar's position that a case from this Court generally forbids telling a resentencing jury that the defendant was previously sentenced to death.  *See Hitchcock v. State*, 673 So. 2d 859, 863 (Fla. 1996).  Though *Hitchcock* does not provide extensive doctrinal justification for this rule,[6] we treat it as controlling precedent for purposes of this opinion.[7]  And two, we accept that the judge actually said what the transcript indicates, i.e., that Kaczmar was previously sentenced "to death in this case."  The circuit court found this fact, and it is supported by competent, substantial evidence.  Nevertheless, even assuming these two premises, we disagree with the circuit court's ultimate finding of prejudice.

First, the statement itself was not as prejudicial as Kaczmar claims.  He focuses exclusively on the fact that the judge referenced

---

6.  Before announcing this rule, the Court in *Hitchcock* specifically acknowledged that its remand on a separate penalty-phase issue rendered further discussion "unnecessary."  *Id.* at 863 (characterizing its prospective analysis as providing "guidance").

7.  Neither party has asked us to reevaluate *Hitchcock*.

- 17 -

his prior death sentence. However, as critical to our analysis, Kaczmar overlooks other statements by the judge that would substantially ameliorate the effect of the death-sentence remark. The judge indicated that the case came back from this Court for a new penalty phase. That statement necessarily implies that we invalidated the death sentence. Thus, the jury knew that the prior sentence was no longer valid, and it had no reason to regard the vacated sentence as somehow deserving continued respect or deference. *Bacon v. Lee*, 225 F.3d 470, 484 n.4 (4th Cir. 2000); *cf. Howell v. Trammell*, 728 F.3d 1202, 1224 (10th Cir. 2013) ("[E]vidence of a prior death sentence may not produce a unidirectional bias toward death." (quoting *Romano v. Oklahoma*, 512 U.S. 1, 20 (1994) (Ginsburg, J., dissenting))). Thus, we do not think that the content of the court's prior-death-sentence statement irretrievably disposed the jury to favor a death recommendation, as Kaczmar seems to argue.

Apart from this, the statement was quite brief. It takes up less than four lines in a penalty-phase transcript that spans nearly 700 pages. Moreover, the transcript strongly suggests that the judge's statement as a whole was not a model of clarity. Specifically, the

- 18 -

transcript indicates that the judge misspoke and then, per the court reporter's testimony, "stumbled" verbally.

The statement was not only brief and likely muddled, but the fact of Kaczmar's prior death sentence was not mentioned again during the penalty-phase proceeding. The judge did not repeat his statement in the preliminary or closing instructions, nor did the parties present any argument based on the statement.

We also underscore that the judge instructed the jury to consider only the *evidence* it received at the penalty-phase hearing in determining the proper sentencing recommendation. It is undisputed that no evidence of Kaczmar's prior sentence was introduced at the penalty phase. Accordingly, we may presume that the jury followed that instruction and based its sentencing verdict on the penalty-phase evidence alone, not an isolated statement uttered prior to jury selection. *See Strickland*, 466 U.S. at 694 ("In making the determination whether the specified errors resulted in the required prejudice, a court should presume . . . that the . . . jury acted according to law."); *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions." (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987))).

We acknowledge that this presumption can be rebutted. But in our review of the entire record, we see nothing that would displace it. Notably, we are not alone in relying on this presumption to deny *Strickland* relief. *See, e.g., McHone v. Polk*, 392 F.3d 691, 708 (4th Cir. 2004); *Perry v. McCaughtry*, 308 F.3d 682, 690 (7th Cir. 2002); *Brown v. Jones*, 255 F.3d 1273, 1280 (11th Cir. 2001).

Our decisions in the direct-appeal context bolster our no-prejudice holding here. *Hitchcock* generally prohibits advising a resentencing jury that the defendant had been previously sentenced to death for the same murder at issue in the current penalty phase. 673 So. 2d at 863. However, *Hitchcock* says nothing about the appropriate remedy. In fact, it appears we have never reversed a death sentence solely on the basis that the jury was informed about the defendant's prior death sentence. Instead, on at least one occasion, we found this type of error to be harmless. *Teffeteller v. State*, 495 So. 2d 744, 747 (Fla. 1986). If this sort of error can be harmless in the sense that it had no reasonable possibility of affecting the outcome of the proceeding, *see Sexton v. State*, 402 So. 3d 270, 280 (Fla. 2024) (describing the harmless error standard on

- 20 -

direct appeal), it logically follows that the effect of such a statement is not always prejudicial. Notably, Kaczmar has not cited any Florida cases reversing convictions—whether on direct appeal or in collateral proceedings—based on comparable comments.[8] We think that omission is telling.

Kaczmar also suggests that the court's prior-death-sentence statement was an erroneous instruction and that erroneous instructions will almost always result in *Strickland* prejudice where trial counsel fails to object to them. We need say little about this argument. We doubt whether the judge's prior-death-sentence statement could be deemed an instruction. But even if it could be, that characterization would not help Kaczmar. Contrary to his

---

8. Kaczmar cites a 1983 decision in which a federal appeals court found ineffective assistance in counsel's agreement with an instruction that advised the jury of the fact that the defendant had been found guilty of the charged conduct in a prior proceeding. *See Arthur v. Bordenkircher*, 715 F.2d 118, 119 (4th Cir. 1983). That decision preceded *Strickland*, has been limited by the court that issued it, *see Turner v. Williams*, 35 F.3d 872, 899-900 (4th Cir. 1994), *overruled on other grounds by O'Dell v. Netherland*, 95 F.3d 1214 (4th Cir. 1996) (en banc), and is—in our view—not well-reasoned. Accordingly, we decline to follow it.

Kaczmar also cites, as support for his argument, Justice Pariente's dissent from the denial of his motion for rehearing. We find his reliance on that dissent to be misplaced.

arguments, our cases have concluded that instructional errors can be harmless on direct appeal and nonprejudicial on collateral review. *E.g.*, *Hunter v. State*, 8 So. 3d 1052, 1071 (Fla. 2008) (direct appeal); *Gonzalez v. State*, 990 So. 2d 1017, 1026-27 (Fla. 2008) (collateral review). Our holding here aligns with those cases.

Based on our analysis above, we conclude that Kaczmar failed to show prejudice from the judge's prior-death-sentence statement. Accordingly, Kaczmar cannot establish a *Strickland* violation, and the circuit court erred in granting relief on that basis. We acknowledge our dissenting colleague's sincere views to the contrary. We, however, disagree with the dissent's key premise that this brief comment tainted the entirety of the penalty-phase proceeding. Thus, we remain convinced that our analysis is faithful to *Strickland*, aligns with our own precedent, and correctly applies the law to the relevant facts of Kaczmar's case. We now turn to Kaczmar's cross-appeal.

### III

In his cross-appeal, Kaczmar challenges the denial of 24 claims and numerous subclaims. Some of these claims raise legitimate issues, but many are conclusory and lack any significant

legal analysis or support. Other claims border on frivolous. Though we have carefully considered all of Kaczmar's arguments, we devote the majority of our analysis to his substantial claims. Ultimately, we find none of Kaczmar's claims to be meritorious and affirm the circuit court's denial of guilt-phase relief.

A

Kaczmar alleges that his counsel was ineffective for failing to seek suppression of statements he made to his cellmate, William Filancia, and to Detective Humphrey, who portrayed himself as Filancia's friend "Carlos." Kaczmar asserts that suppression was warranted under U.S. Supreme Court precedent interpreting the Sixth Amendment.[9] Before analyzing this claim, we discuss those precedents.

1

In a series of cases beginning with *Massiah v. United States*, 377 U.S. 201 (1964), the U.S. Supreme Court has held that the Sixth Amendment prohibits government agents from deliberately

---

9. He also claims that counsel should have argued a theory of entrapment to the jury. We reject this subclaim without further analysis.

eliciting incriminating statements from an accused once judicial proceedings have been initiated against him, unless counsel is present or the accused has waived that right. *Id.* at 206; *Brewer v. Williams*, 430 U.S. 387, 400-01 (1977); *United States v. Henry*, 447 U.S. 264, 274 (1980); *Maine v. Moulton*, 474 U.S. 159, 176-77 (1985); *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986).

As suggested above, this rule can apply to informants eliciting the incriminating statements on behalf of law enforcement. Indeed, "*Massiah* established that cooperating government informants *can* be considered '[g]overnment agents.'" *United States v. Age*, 136 F.4th 193, 232 (5th Cir. 2025) (alteration in original) (quoting *Massiah*, 377 U.S. at 206). To establish a *Massiah* violation when an informant is involved, the defendant must demonstrate that (1) the Sixth Amendment right had attached; (2) "the informant . . . was promised, reasonably led to believe that he would receive, or actually received a benefit in exchange for soliciting information from the defendant, and . . . acted pursuant to instruction from the State, or otherwise submitted to the State's control"; and (3) the informant "deliberately elicited" the incriminating statements. *Id.* (quoting *Thompson v. Davis*, 941 F.3d 813, 816 (5th Cir. 2019)). In

discussing these requirements, the Fifth Circuit noted:

> Acting "in the hopes of" receiving a benefit is insufficient to establish a *Massiah* violation; affirmative enticement from the Government, however, does establish such a violation. Timing is critical for determining whether the Government is controlling and steering the conversation. "The Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached." Crucially, "an informant cannot be an agent of the State without the State's knowledge or consent."

*Id.* at 232-33 (citations omitted).

2

In this case, Filancia was housed with Kaczmar on at least two occasions, and they often discussed their cases. This much we know. However, the exact timing of particular statements and discussions is less clear.

Kaczmar's core argument is that his incriminating statements were made after Filancia would be considered an "agent" for *Massiah* purposes. We acknowledge there is some evidence to support Kaczmar's position. Significantly, however, there is also competent, substantial evidence in the record that Kaczmar made incriminating remarks (including admissions of guilt) soon after the two became cellmates and that Filancia simply listened to Kaczmar

talk about his case up to a certain point. Indeed, during trial, Filancia testified that he decided to inform on Kaczmar after Kaczmar expressed interest in framing Modlin.[10] Thus, any incriminating statements Kaczmar made prior to this point—i.e., before law enforcement directed Filancia to do more than just listen to Kaczmar—would not have been suppressible under *Massiah*. *See Kuhlmann*, 477 U.S. at 459. Notably, the circuit court credited this evidence as to timing, and we will not second-guess that determination. Accordingly, we accept that Kaczmar made some incriminating statements before Filancia became an agent for purposes of *Massiah*.

This recognition brings to light another problem for Kaczmar's *Massiah* claim. At trial, Filancia testified to a number of incriminating statements attributable to Kaczmar. However, Kaczmar does not attempt to identify when any of the statements were actually made. Kaczmar has the burden to demonstrate a constitutional violation. *See Truehill*, 358 So. 3d at 1175. Thus, absent argument establishing that a particular comment came after

---

10. Filancia's evidentiary-hearing testimony generally aligns with his trial testimony on the subject of timing.

Filancia's agency was established, Kaczmar cannot demonstrate a necessary component of his *Massiah* claim.  In short, Kaczmar has not established deficiency based on counsel's failure to seek suppression of the entire body of statements made to Filancia or any statements in particular.

3

Our analysis differs with respect to Detective Humphrey—the undercover officer involved in the "Carlos" operation.  Recall that Detective Humphrey portrayed himself as one of Filancia's friends, who could help Kaczmar in connection with the charges.  Detective Humphrey spoke with Kaczmar on four occasions at the jail, during which time the two discussed planting evidence and manufacturing favorable witnesses.  Kaczmar's wife Priscilla gave $300 to Detective Humphrey for the services he claimed to have performed.

We agree with Kaczmar that this evidence is likely the product of a *Massiah* violation.  By the time of Detective Humphrey's involvement, Kaczmar had been charged with Ruiz's murder.  Counsel was not present during the jail visits, nor did Kaczmar say anything that could be viewed as a waiver of counsel.  Furthermore, we have no doubt that Detective Humphrey, a law enforcement

officer, deliberately elicited the incriminating statements. We thus conclude that counsel was deficient for failing to seek suppression of the incriminating statements made during Kaczmar's meetings with Detective Humphrey.[11]

However, this finding of deficiency does not, by itself, warrant relief. *Strickland*, 466 U.S. at 693-96. Instead, Kaczmar must also show prejudice from that deficiency. *See Weaver v. Massachusetts*, 582 U.S. 286, 300 (2017) (violation of *Strickland* not complete until prejudice is demonstrated). In the guilt-phase context, prejudice means a reasonable probability of an acquittal, absent the attorney's error. *See Truehill*, 358 So. 3d at 1182. Kaczmar has not shown this.

The State presented uncontroverted evidence that Ruiz was murdered. The medical examiner testified that Ruiz was stabbed 93 times, which caused her death. In addition, the State presented strong evidence tying Kaczmar to the scene of the crimes. For instance, Kaczmar's former neighbor, Julia Ferrell, testified that she

---

11. At the evidentiary hearing, counsel testified that he did not object to this evidence because he did not see a basis for suppressing or excluding it. Consistent with that testimony, counsel offered no strategic reason for this conduct.

heard him yelling loudly at around 5:00 or 5:30 a.m., which is roughly an hour before the house fire was observed. Ferrell's grandson gave testimony that aligned with hers.

There was also video and photographic evidence showing Kaczmar buying a small amount of gasoline (using a handheld container) just before 6:00 a.m. at a station less than a mile from the Kaczmar home. Critically, testimony at trial established that gasoline was used in setting the home ablaze.[12]

What is more, Kaczmar admitted that he and Ruiz were alone in the home in the hours preceding the murder. That admission is supported by cell phone records that are consistent with Kaczmar making or receiving several calls at the home from 10:53 p.m. to 1:41 a.m.[13]

Additionally, there is the DNA evidence. Expert witness Maria Lam testified that she selected ten areas on Kaczmar's socks for

---

12. Kaczmar does not challenge the evidence tying him to the arson.

13. No evidence came to light at the evidentiary hearing that would cast doubt on that admission. If anything, evidence received at this hearing confirmed that Kaczmar was present and alone with Ruiz.

DNA testing—all ten areas coming from stains giving positive indications for the presence of blood. One such stain generated a mixed profile, with Ruiz's DNA being the major donor. Kevin McElfresh, another DNA expert, confirmed the accuracy of Lam's analysis. He opined, "The only reasonable scientific explanation is that that was Maria Ruiz' blood on those socks."

The State also presented a significant amount of other consciousness-of-guilt evidence. As noted before, the evidence demonstrated that Kaczmar burned down the house in which Ruiz was found. *Kaczmar I*, 104 So. 3d at 1005 (discussing some of this evidence). Cell phone evidence showed that Kaczmar was fleeing the scene at the time witnesses spotted the house fire. In addition, Kaczmar was dishonest in his dealings with police.[14] For instance, Kaczmar lied to police when he said that he was fishing in the hours before the murder, when that was not the case. And he smeared his own blood on his sock after he knew that he would be leaving it (and other articles of clothing) at the police station.

Finally, Kaczmar gave a detailed confession to Filancia. As

---

14. Indeed, Kaczmar admitted at the postconviction evidentiary hearing that he lied to police.

part of that confession, Kaczmar said that he wanted to have sex with Ruiz and, when she declined his unwanted advances, he stabbed her to death.

Our prejudice analysis must also take into account the suppressible evidence and what effect it reasonably could have had on the jury's verdict. *See Jackson*, 347 So. 3d at 300, 307. That evidence included Kaczmar's statements and conduct in dealing with Detective Humphrey. Undoubtedly this evidence was useful to the State, and the prosecutor did, in fact, underscore it in his opening statement and closing argument. Nevertheless, we do not find that such circumstances require a finding of prejudice.

The suppressible evidence of the undercover operation was used to show consciousness of guilt. As noted above, the State had already presented a great deal of this type of evidence. Thus, the evidence of the undercover operation was only a part (albeit a significant component) of the State's considerable consciousness-of-guilt evidence. In light of all the evidence, we are not persuaded that there is a reasonable probability that the jury would have acquitted Kaczmar had it simply not heard the suppressible evidence and argument related to it.

Accordingly, Kaczmar has failed to show prejudice and, consequently, is not entitled to a new trial based on his counsel's failure to seek suppression of the undercover-operation evidence.

B

Kaczmar argues that counsel was deficient in failing to object to certain testimony by Detective Sharman. Specifically, on redirect examination, Detective Sharman testified that Filancia did not "make up" the fact that Kaczmar told him about the location of the knife used in the murder.[15] Counsel did not object. The circuit court assumed deficient performance but found no prejudice.

We likewise find no prejudice without addressing *Strickland*'s performance prong. Here, the challenged testimony was brief. Moreover, Detective Sharman did not state, or even imply, that Filancia had been an overall honest or trustworthy informant—just that he did not believe that Filancia invented the details about the

___

15. *See Johnson v. State*, 404 So. 3d 538, 540 (Fla. 3d DCA 2025) ("It is well settled that 'it is an invasion of the jury's exclusive province for one witness to offer his personal view on the credibility of a fellow witness.' " (quoting *Boatwright v. State*, 452 So. 2d 666, 668 (Fla. 4th DCA 1984))).

knife's location.[16]  In addition, the prosecutor did not reference this testimony at any point in his closing argument.

We also recognize that the jury was instructed on its sole responsibility to assess witness credibility, which would be inconsistent with any deference being given to the views of one witness on the credibility of another.  Again, we assume the jury followed the law as embodied in that instruction, and we see nothing in the record to rebut that presumption.  *See Strickland,* 466 U.S. at 694.  Finally, as noted earlier, the State presented overwhelming evidence of guilt.  Considering the totality of the State's proof, Detective Sharman's brief, relatively benign bolstering testimony was not prejudicial under *Strickland.*

## C

Kaczmar also argues that counsel was ineffective for inducing testimony by Filancia that he believed Modlin was innocent due to

---

16.  That fact distinguishes this case from *Tumblin v. State,* 29 So. 3d 1093, 1095, 1100-01 (Fla. 2010), and *Page v. State,* 733 So. 2d 1079, 1080-81 (Fla. 4th DCA 1999), where the bolstering witnesses expressed more expansive and direct views of the veracity of the witnesses.  We also add that *Tumblin* and *Page* involved direct appeals—not collateral proceedings like in this case.

the fact that Modlin passed a lie-detector test. The circuit court found no deficient performance, and we agree.

While being deposed by trial counsel, Filancia indicated that Modlin passed a lie-detector test about Ruiz's murder. Counsel obtained an order forbidding mention of this fact. During cross-examination at trial, counsel asked Filancia how he could know that Modlin was actually innocent. It was that question that led to the lie-detector testimony. We believe that counsel—in framing his questions—could have reasonable confidence that Filancia was both aware of the trial court's order and would obey it. We also note that counsel obtained an instruction seeking to minimize any harmful effect of this testimony.[17] Accordingly, we find no deficiency in counsel's phrasing of this question to Filancia.

D

Kaczmar contends that counsel was ineffective for not

---

17. In his motion, Kaczmar argued that counsel should have objected to Filancia's testimony that he thought Modlin was innocent. But in his briefs here, he offers nothing more than conclusory assertions on this subject. Accordingly, we find this argument forfeited. *See Jackson*, 347 So. 3d at 300 (affirming denial of *Strickland* claim where appellate argument was "undeveloped and conclusory").

presenting the jury with certain exculpatory statements that he made to Detective Humphrey during their jailhouse discussions. We, like the circuit court below, find this claim to be without merit.

During his talks with Detective Humphrey, Kaczmar indicated at various times that he was innocent of the murder. Counsel argued that this evidence was admissible under the rule of completeness. The court agreed, but it accepted the prosecutor's position that if the exculpatory statements came into evidence under that rule, the prosecutor could introduce evidence of Kaczmar's prior convictions. In light of that ruling, counsel made a sensible strategic decision to forgo the exculpatory statements in favor of keeping Kaczmar's convictions out of evidence. Indeed, at the evidentiary hearing, counsel testified that keeping Kaczmar's convictions from the jury allowed for stronger conviction-based impeachment of Filancia and Modlin. That testimony, which the circuit court credited, supports rejection of this claim. *See Gregory v. State,* 224 So. 3d 719, 733 (Fla. 2017) ("[C]ounsel's reasonable

trial decisions do not constitute ineffective assistance.").[18, 19]

## E

Kaczmar argues that counsel was ineffective for failing to impeach or refresh the recollection of his former neighbor Julia Ferrell based on her deposition testimony. The circuit court rejected this argument. We find that ruling to be supported by competent, substantial evidence and in accord with the law.

At trial, Ferrell testified about overhearing a very heated argument shortly before the fire. She indicated that one of the two voices was Kaczmar's. When pressed by defense counsel about the

---

18. Kaczmar relies on what he perceives to be misstatements of law that counsel made at the postconviction evidentiary hearing. His reliance on such testimony, though, is misplaced. Put simply, none of this testimony suggests that counsel's prioritization was informed by any misunderstanding of evidence law.

19. It is evident from the briefing that Kaczmar's current counsel strongly disagrees with trial counsel's choice to prioritize stronger impeachment over introducing the exculpatory evidence. That disagreement alone is not a basis for finding counsel deficient. *Occhicone v. State*, 768 So. 2d 1037, 1048 (Fla. 2000) ("Counsel cannot be deemed ineffective merely because current counsel disagrees with trial counsel's strategic decisions." (citing *Strickland*, 466 U.S. at 689)). Also, to the extent Kaczmar is obliquely attacking the court's evidentiary ruling at trial, that issue was decided against him long ago, *see Kaczmar I*, 104 So. 3d at 1000, and is not subject to reconsideration now, *see* Fla. R. Crim. P. 3.851(e)(1); *Hendrix v. State*, 136 So. 3d 1122, 1124 (Fla. 2014).

source of the other voice, Ferrell expressed uncertainty as to whether it was a male or female voice. It was at this point that Kaczmar claims his counsel should have impeached Ferrell or refreshed her recollection with her deposition testimony. In her deposition, Ferrell indicated that she thought both participants in the altercation had male voices but maintained some level of uncertainty.

We think that a competent attorney could have reasonably decided against impeaching Ferrell on this basis. We doubt that Ferrell's deposition and trial testimony are sufficiently in tension to justify impeachment by prior inconsistent statement. We have said that "[t]o be inconsistent, a prior statement must either directly contradict or be materially different from the expected testimony at trial." *Pearce v. State*, 880 So. 2d 561, 569 (Fla. 2004).

Here, Ferrell never claimed at trial or in her deposition that she was certain that both participants had male voices. Indeed, it appears that she maintained reasonable consistency with respect to the second voice. At trial, on direct examination, she indicated that she thought the second voice was that of Kaczmar's uncle—a male. And in her deposition, she expressed a fairly strong belief that it

also came from a male—though she was less than certain. In light of this common ground, we see nothing unreasonable about declining to impeach on the grounds of prior inconsistency.

But there is another reason why we do not find deficient performance. As a precondition to this type of impeachment, the witness must be given a chance to explain the past statement. *Id.* at 570. Based on the testimony that came out on direct examination—i.e., that Ferrell thought the second voice came from Kaczmar's uncle—a reasonable attorney could have decided to rely on that evidence rather than give Ferrell a chance to explain any differences in her deposition testimony in a way that would be potentially damaging to Kaczmar. Seeking to avoid that potential risk, a reasonable attorney could have forgone this possible avenue of impeachment (again, involving an obviously unfavorable witness who was adamant that she heard Kaczmar yelling) and instead sought to backdoor in Ferrell's comparable statements through the testimony of responding officers. That is, in fact, what defense counsel unsuccessfully tried to accomplish. The trial court's adverse evidentiary ruling says nothing about either the risk

avoided or the fact that the deposition testimony did not offer significant impeachment value, even if admissible.

Kaczmar's recollection-refreshed argument fares no better. As a matter of evidence law, a party is not allowed to refresh a witness's recollection unless there is some indication that the witness has forgotten something—hence the need for the witness's memory to be jogged. *See Reid v. State*, 799 So. 2d 394, 398 (Fla. 4th DCA 2001).

Here, there is nothing in Ferrell's trial testimony indicating that any tension with the deposition was based on her lack of memory. And in postconviction proceedings, Kaczmar did not call Ferrell as a witness or attempt to prove lack of recollection by another means. As such, Kaczmar has failed to prove deficient performance.

F

Kaczmar argues that counsel was ineffective for calling Detective Goldner as a witness at trial. In rejecting that argument, the circuit court found a reasonable strategic reason for counsel's decision to call this particular witness. The record supports that ruling.

Detective Goldner conducted a search of Kaczmar's vehicle, during which he located and collected evidence of certain nondescript stains. Evidence of the stains was never sent for testing. Counsel seized on the lack of testing to support the theory that the police's investigation was incomplete. As the circuit court found, that strategic decision does not fall outside the wide range of reasonably competent performance. *See Banks v. State*, 219 So. 3d 19, 29 (Fla. 2017).

G

Kaczmar asserts that counsel was ineffective for failing to impeach Filancia by highlighting the nature and underlying details of the charges for which he was jailed. We agree with the circuit court that this claim could be denied on the basis of the preexisting record. *Allen v. State*, 416 So. 3d 291, 302 (Fla. 2025) (summary denial proper if existing record refutes claim).

According to Kaczmar, counsel should have impeached Filancia when he testified that he and Kaczmar were friendly and that he believed Kaczmar trusted him. As Kaczmar sees it, the details of Filancia's charged crimes would have seriously undermined Filancia's trust-related testimony.

We find this claim to be meritless. Counsel was well aware that the jury had already heard evidence indicating that Kaczmar was friendly with and trusted Filancia to some extent. Based on that reality, we believe that a competent lawyer could—as counsel did here—focus on more promising areas of impeachment. *Truehill*, 358 So. 3d at 1178 (finding that counsel acted reasonably in declining to impeach witness on ground that would have offered limited value in light of other evidence at trial).

H

Kaczmar argues that trial counsel was ineffective in failing to challenge the State's DNA evidence. We agree with the circuit court that this argument lacks merit. We assess Kaczmar's DNA-related claim in several parts.

1

Kaczmar faults counsel for failing to object to the prosecutor's statement in opening argument that Ruiz's blood was on his sock. We see no prosecutorial misconduct that would have warranted an objection.

"Opening remarks are not evidence, and the purpose of opening argument is to outline what an attorney *expects* to be

established by the evidence." *Truehill*, 358 So. 3d at 1177

(emphasis added) (quoting *Occhicone v. State*, 570 So. 2d 902, 904

(Fla. 1990)).  Here, the prosecutor stated what he expected the

evidence would show with respect to the source of the blood on

Kaczmar's socks.  That comment was completely permissible.

*See Schoenwetter v. State*, 46 So. 3d 535, 549 (Fla. 2010)

("[C]ounsel cannot be deemed ineffective for failing to make a

meritless objection.").

Moreover, we reject Kaczmar's argument that evidence at trial

did not align with the prosecutor's predictive assertion.  In fact, the

profile that Lam primarily discussed was generated from a blood

stain, and Ruiz was the major contributor for that profile.  On top of

this, McElfresh specifically testified that "[t]he only reasonable

scientific explanation is that that was Maria Ruiz' blood on those

socks."[20]  That testimony is consistent with the State's

postconviction expert's testimony—i.e., that there is a "high

---

20. Kaczmar suggests that McElfresh's testimony could not support the prosecutor's claims, indicating that he lacked the qualifications to opine on the source of the DNA.  Kaczmar never alleged in his motion that McElfresh was not qualified to give that testimony.  Accordingly, any qualification-based argument would be unpreserved.  *See Jackson*, 347 So. 3d at 300-01.

probability that the DNA from [Ruiz] as the major contributor would be from blood DNA."[21]

2

Kaczmar also faults counsel for not having his retained DNA expert, Candy Zuleger, attend and assist at trial. Based on our review of the record, we do not think that Zuleger's presence was necessary to respond effectively to the State's DNA evidence. Indeed, even without Zuleger's presence, counsel was still able to underscore defense-friendly aspects of the DNA evidence.

For instance, with the assistance of Zuleger's report, the defense was able to highlight the possibility of a third contributor to the DNA profile. Counsel also succeeded in getting both of the State's DNA experts to acknowledge some theoretical ways that Ruiz's DNA could get on Kaczmar's socks. Counsel also got Lam to admit that DNA testing cannot show things such as age.

In light of these circumstances and others, Kaczmar cannot show that Zuleger's presence at trial was so essential that every

---

21. To the extent Kaczmar faults counsel for not objecting to similar comments in closing argument about Ruiz's blood being on Kaczmar's socks, his reliance on such comments is misplaced for the reasons given above.

reasonable lawyer in counsel's position would have insisted on her presence. *Cf. Harrington*, 562 U.S. at 111 ("In many instances cross-examination will be sufficient to expose defects in an expert's presentation.").[22]

3

Next, Kaczmar claims ineffectiveness in counsel's decision to refrain from cross-examining Lam on the ground that Ruiz's DNA could have come from a non-blood source. As noted above, the DNA profiles came from areas that tested positive for the presence of blood. Counsel accepted the common-sense inference that Ruiz's blood was the source of the DNA. In fact, in Kaczmar's direct appeal, we reviewed the record and drew a comparable inference. We said that the scientific evidence showed that Ruiz's blood was on Kaczmar's sock. *Kaczmar I*, 104 So. 3d at 997.

We also add that instead of contesting whether Ruiz's blood was the source of the DNA on Kaczmar's socks, counsel sought to

---

22. To the extent Kaczmar is separately arguing ineffectiveness based on counsel's failure to call Zuleger as a *witness* at trial, such an argument would lack merit. Counsel testified that he did not call Zuleger because she would have corroborated significant aspects of Lam's testimony.

undermine the significance of the DNA evidence—highlighting the possibility of a third donor and the inability to establish the age of the DNA. Choosing this route allowed the defense to blunt some of the force of the DNA evidence and raise questions about a possible unknown killer, while at the same time maintaining credibility with the jury. Indeed, counsel testified at the evidentiary hearing that one of his strategic concerns was maintaining credibility with the jury. That credibility might well have been jeopardized had counsel pressed more remote possibilities of the source of Ruiz's DNA.[23]

4

Additionally, Kaczmar criticizes counsel for failing to "put [in] testimony about the ten samples" to underscore that Ruiz was the major contributor for only two of the samples, while Kaczmar was the major contributor for six of them. Though we think counsel could have brought these topics up with the State's experts, counsel was not unreasonable in focusing on different ways to blunt the

---

23. It was not until the postconviction hearing that Kaczmar himself gave an indication that Ruiz wore his father's socks and that the household's dirty laundry was stored and washed together. No witness at trial testified to such things. Nor do we have any basis for concluding that counsel was aware of these or similar alleged facts.

force of the DNA evidence against Kaczmar.[24]  We have already recounted some of those efforts.  Moreover, highlighting the individual profiles would have posed its own issues.  The jury would have been reminded that Ruiz's DNA was found on at least eight separate areas of the socks (all testing positive for the presence of blood), as opposed to hearing about the results as to just one particular sample.  Perhaps, despite these concerns, current counsel would have nonetheless pressed the State's expert on the number of samples tested and underscored that Ruiz was the major contributor for two of them.  But that difference of opinion does not mean that defense counsel was deficient.  *See Strickland*, 466 U.S. at 689 ("There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.").[25]

_____

24.  At the postconviction hearing, counsel testified that he saw no reason to point out that Kaczmar was the major donor for some of the samples.  That assessment seems eminently reasonable to us.

25.  Kaczmar also asserts that counsel should have objected to the prosecutor's statement in closing argument about Ruiz being the major contributor to the DNA profile on the socks.  Kaczmar failed to raise this argument in his motion below.  Therefore, it has not been preserved.  *See Jackson*, 347 So. 3d at 300-01.  Moreover,

In conclusion, Kaczmar has not shown any deficient performance in connection with the DNA evidence.

I

Kaczmar argues that his counsel was ineffective for failing to present a chain-of-custody argument for keeping his bloody socks out of evidence. We, like the circuit court below, reject this argument.

Under Florida law, a defendant seeking to exclude physical evidence based on a break in the chain of custody must make a threshold showing of probable tampering. *See Davis v. State*, 383 So. 3d 717, 739 (Fla. 2024). Here, Kaczmar fails to point to any evidence indicating that his socks were tampered with after he left them in the custody of law enforcement. This being the case, no showing of probable tampering has been proffered.

---

a competent lawyer in trial counsel's position might well have declined to object here because the major-/minor-donor distinction was not a particularly damaging aspect of the DNA evidence. Rather, what made this evidence particularly devastating is that Ruiz's DNA was on the socks Kaczmar was wearing on the day of the murder and the DNA came from stains that tested positive for the presence of blood.

Resisting this straightforward analysis, Kaczmar contends that he himself did the tampering, when he smeared blood on one of the socks. But Kaczmar's reliance on his own conduct is misplaced. As already noted, this conduct occurred prior to Kaczmar's departure from the interview. Any "tampering" done by Kaczmar does not raise concerns that the socks admitted into evidence at trial differed from the socks that Kaczmar wore to the police station and smeared blood on.[26]

In short, Kaczmar's chain-of-custody argument lacks merit. As a consequence, we do not fault counsel for failing to raise it.

J

Kaczmar argues that trial counsel was ineffective in failing to challenge cell phone related evidence presented by a detective who investigated the murder. We agree with the circuit court that this argument lacks merit.

Detective Danillo Matos gave testimony at trial concerning the

---

26. We also question whether a defendant's own conduct could ever constitute the probable tampering necessary for purposes of chain-of-custody exclusion. *See Gonzalez v. State*, 136 So. 3d 1125, 1147 (Fla. 2014) (refusing to grant appellate relief where appellant was responsible for the claimed error). However, we need not decide this issue in order to deny relief.

location of Kaczmar's cell phone based on records indicating which cell towers were involved in certain phone calls. For instance, Detective Matos testified that the cell-tower evidence was consistent with Kaczmar being present at the home early in the morning on the day of the murder. To support the ineffectiveness claim directed at this evidence, Kaczmar called an expert to testify at the postconviction evidentiary hearing. Despite having issues with how Detective Matos framed some of his trial testimony, the expert did not challenge any of the detective's underlying analysis.

Aside from the lack of evidence regarding any analytical shortcoming by Detective Matos, counsel's testimony at the evidentiary hearing dooms this claim. As revealed at the hearing, Kaczmar admitted that he was present at the house during the relevant time frames. And by Kaczmar's own admission to police, he was present at his home from roughly 11:00 p.m. to 2:00 a.m.—the times at issue with this claim. Based on these two admissions, counsel would have had little reason to challenge evidence placing Kaczmar near the crime scene at the relevant times. Put simply, in light of this evidence, we cannot see how counsel could possibly be deemed deficient for not challenging Detective Matos's cell-tower

testimony. *See Smith v. State*, 330 So. 3d 867, 880 (Fla. 2021) ("A decision that lodging a particular challenge to the validity of evidence would be a waste of resources in light of counsel's knowledge of corroborating facts including the defendant's confession can be a reasonable strategic decision." (citation modified) (quoting *Patrick v. State*, 246 So. 3d 253, 262 (Fla. 2018))).

## K

Kaczmar argues that trial counsel was ineffective in failing to object to the evidence of his drug use and the instruction on the legal effect of voluntary intoxication. This argument is meritless.

The record shows that counsel made a strategic choice not to challenge the evidence of his drug use. And Kaczmar, in our view, has not demonstrated that counsel's strategic decision was unreasonable under the circumstances of this case. *See Sheppard*, 338 So. 3d at 816. As for the voluntary-intoxication instruction, Kaczmar has not convinced us that the instruction given was an inaccurate statement of law or shown how it somehow operated in an unlawful fashion in this particular case. In light of this, we do not see how Kaczmar can show deficiency in failing to object to an

instruction that Kaczmar fails to show was incorrect or unsound. *See Davis v. State*, 136 So. 3d 1169, 1201 (Fla. 2014) (counsel not deficient for failing to object to a proper jury instruction).

L

Kaczmar argues that trial counsel was ineffective for failing to object to certain comments made by the prosecutor. The circuit court found the preexisting record sufficient to refute this claim. Kaczmar has not shown that this ruling was wrong.

In his briefs, Kaczmar reproduces a number of prosecutorial comments in closing argument, which he believes necessitated objections from counsel. Based in part on how this issue has been briefed to us, we decline to offer a point-by-point analysis of each of the comments that Kaczmar faults. Instead, having reviewed all the comments in the context of the prosecutor's overall argument, we conclude that none were so egregious that all reasonable lawyers would have objected to them. *See Jackson*, 347 So. 3d at 304.

M

Kaczmar argues that trial counsel was ineffective for failing to sufficiently investigate the details underlying Filancia's plea agreement and specifically learn that Filancia was facing a lowest

permissible sentence of 65 years in prison. The circuit court found that counsel acted reasonably in focusing on other avenues of impeachment. We agree with that ruling.

At the outset, we note that there was evidence at the postconviction hearing indicating that counsel was, in fact, aware of the State's view of Filancia's lowest permissible sentence. Based on that awareness, we think counsel's choice of using other impeachment evidence represents an informed judgment to forgo one arguable basis for impeachment in favor of others believed to be more promising. *Truehill*, 358 So. 3d at 1182 (reasonable for counsel to forgo certain avenues of impeachment in favor of more targeted cross-examination); *Kessler v. Cline*, 335 F. App'x 768, 770 (10th Cir. 2009) (extent and manner of cross-examination of a particular witness "is a strategic choice and therefore 'virtually unchallengeable' " (quoting *Strickland*, 466 U.S. at 690)). Counsel introduced Filancia's prior convictions, presented evidence that Filancia had access to Kaczmar's court papers, and showed the extremely favorable aspects of Filancia's plea agreement (which essentially took a life sentence off the table and included a 20-year

sentencing cap). Kaczmar has failed to show ineffectiveness in this regard.

N

Kaczmar argues that trial counsel was ineffective in failing to request a special instruction on what he characterizes as a "heat of passion" defense. The circuit court found no deficient performance, and we agree with that ruling.

Florida law recognizes a "heat of passion" defense, which can provide either a partial or complete defense to premeditated first-degree murder. *Taylor v. State*, 316 So. 3d 420, 427 (Fla. 1st DCA 2021). As relevant here, when operating as a partial defense, "heat of passion" negates the premeditation mens rea. *Id.*

A core requirement of this defense—whether partial or complete—is that the defendant is acting upon a "sudden sufficient provocation" and not "a bad or corrupt heart." *Id.* The provocation must be of such a magnitude that it would "obscure the reason or dominate the volition of an ordinarily reasonable [person]." *Id.* (quoting *Paz v. State*, 777 So. 2d 983, 984 (Fla. 3d DCA 2000)). Critically, absent evidence of sudden provocation, a defendant

cannot succeed on a heat-of-passion defense and is not entitled to an instruction on it.  *Id.* at 427-28.

Based on our review of the record, we conclude that evidence of sudden provocation was lacking, even when viewed in the light most favorable to Kaczmar.  Counsel cannot be held deficient for failing to request an instruction that is not supported by the evidence.

However, even assuming there was sufficient evidence to support a special instruction on this defense, counsel's action was still not objectively unreasonable.  The evidence presented at the guilt phase shows that this defense would have been extraordinarily weak.  Under the only evidence at trial on the sequence of the attack, Kaczmar's own unwelcomed sexual advances caused Ruiz to flee from him and ultimately resort to self-defense.  It was her actions in self-defense that Kaczmar now asserts created the adequate provocation.  We think that a rational jury would have had great difficulty in characterizing Kaczmar's reaction to Ruiz's self-defense as reasonable in any sense.

Additionally, Kaczmar was much larger than Ruiz and could have simply stopped the attack at any time after disarming her.

Instead, according to the medical examiner's uncontroverted testimony, Ruiz was brutally attacked for at least several minutes during which she was stabbed over 90 times. Based on these facts, we think a competent lawyer could forgo seeking an instruction on a defense which would have had little to no chance of succeeding. *See Knowles*, 556 U.S. at 127 ("The law does not require counsel to raise every available nonfrivolous defense. Counsel also is not required to have a tactical reason—above and beyond a reasonable appraisal of a claim's dismal prospects for success—for recommending that a weak claim be dropped altogether." (citations omitted)).

O

Kaczmar argues that the State violated *Brady v. Maryland* by not making him aware that Filancia had been in a relationship with the foster mother of Ruiz's daughter. In rejecting Kaczmar's *Brady* claim, the circuit court reasoned that the impeachment value of this evidence was minimal, and thus the evidence was not material. We agree.

To prevail on his *Brady* claim, Kaczmar "must demonstrate that (1) favorable evidence which is exculpatory or impeaching,

(2) was suppressed by the State, and (3) because the evidence was material, he was prejudiced." *Hutchinson v. State*, 343 So. 3d 50, 54 (Fla. 2022) (citing *Sweet v. State*, 293 So. 3d 448, 451 (Fla. 2020)).

Here, trial counsel had already impeached Filancia on multiple substantial grounds. Counsel pointed out Filancia's multiple felony convictions, stressed Filancia's favorable plea deal, and underscored Filancia's access to Kaczmar's court paperwork. As Kaczmar appears to accept, the relationship evidence would have added only marginal impeachment value. Considering the limited value of the additional impeachment evidence, the substantial grounds on which defense counsel actually impeached Filancia, and the strength of the State's proof, the evidence at issue would not have "put the whole case in such a different light as to undermine confidence in the verdict." *Sweet*, 293 So. 3d at 451 (quoting *State v. Huggins*, 788 So. 2d 238, 243 (Fla. 2001)).

Accordingly, the circuit court did not err in denying Kaczmar's *Brady* claim.

### P

Kaczmar argues that the State violated due process when the

prosecutor failed to correct the false testimony of one of its witnesses. We disagree and affirm the circuit court's rejection of this claim.

As interpreted by the U.S. Supreme Court, the Fourteenth Amendment prohibits prosecutors from presenting or failing to correct material evidence that they know to be false. *Napue*, 360 U.S. at 269; *Giglio*, 405 U.S. at 153-54. To vacate a conviction based on a violation of this principle, a defendant must demonstrate falsity and prosecutorial knowledge of that falsehood. *Glossip v. Oklahoma*, 604 U.S. 226, 246 (2025). But that is not enough. *Hampton v. Shinn*, 143 F.4th 1047, 1068 (9th Cir. 2025). Indeed, a court may not grant relief unless the falsehood was material. *Id.*

Relying on these principles, Kaczmar's claim is that the prosecutor knowingly failed to correct Richard Kuritz's—Filancia's lawyer at the time—false testimony that the reason for Filancia's 20-year sentencing cap was the so-called sentencing guidelines. We accept for purposes of this opinion that Kaczmar satisfied the falsity and knowledge prongs. Accordingly, our focus shifts to materiality.

In discussing this prong, we have described it as "defense friendly," at least in relation to the effect-based prongs of *Brady* and *Strickland*. *See Sheppard*, 338 So. 3d at 829. After all, unlike *Brady* and *Strickland*'s reasonable-probability standard for materiality or prejudice, the materiality standard in the *Giglio*/*Napue* context is whether there is a reasonable possibility of a different outcome. *See Martin v. State*, 311 So. 3d 778, 808 (Fla. 2020). Another distinguishing feature is that the State, not the defendant, must prove lack of materiality. *Id.* Nevertheless, the materiality prong still poses a substantial barrier for relief. Here, three circumstances lead us to conclude that Kuritz's testimony was not material.

First, Kuritz was not one of the key witnesses. *Cf. Glossip*, 604 U.S. at 248 (finding materiality satisfied because the false testimony came from the State's key witness). His overall testimony was brief. The State used his limited testimony to show that Filancia did not get any details about Kaczmar's crimes from him. Not surprisingly, Kuritz offered no details whatsoever as to the events surrounding the crimes.

Second, the guidelines testimony—the subject of the *Napue*

claim—was confusing and difficult to follow. Notably, Kaczmar fails to explain how the jury would have logically assigned any value to it.

Third, the State's proof of guilt was overwhelming, and that proof did not rely at all on Kuritz's testimony. As previously discussed, a witness heard Kaczmar loudly arguing with someone and within an hour he appears on a surveillance video buying gasoline. The house in which he and Ruiz lived burned to the ground—the conflagration aided by gasoline. Kaczmar fled from the scene, repeatedly lied to police, and had Ruiz's blood on his socks. *See Hampton*, 143 F.4th at 1070 (finding no materiality where evidence of guilt was overwhelming).

Q

Kaczmar argues that the cumulative effect of all the errors at his guilt phase deprived him of a fundamentally fair proceeding. We disagree. In our analysis above, we assumed deficient performance under *Strickland* based on counsel's failure to seek suppression of the undercover operation involving Detective Humphrey and counsel's failure to object to Detective Sharman's bolstering testimony. We also assumed the first two prongs of a

*Napue* violation based on Kuritz's guidelines testimony. After considerable analysis, we found that the required prejudice or materiality prongs were not established. We now conclude that even when viewed together, these matters do not undermine our confidence that Kaczmar received a fair and reliable guilt phase. *See Strickland*, 466 U.S. at 696 (focus of prejudice prong is on reliability of outcome); *Catlin v. Broomfield*, 124 F.4th 702, 742-43 (9th Cir. 2024) (focus for *Napue* materiality is on overall fairness of defendant's trial). Thus, Kaczmar has not demonstrated the "requisite prejudice" to support relief on the basis of cumulative error. *See Davis v. State*, 383 So. 3d 743, 761 (Fla. 2024).

We now turn to Kaczmar's penalty-phase claims.

## R

Kaczmar argues that his counsel was ineffective for not impeaching Filancia's former testimony when it was read to the jury at his second penalty phase, which occurred in 2013. We disagree.

At Kaczmar's second penalty phase, the State's proof consisted primarily of the former testimony of ten witnesses at Kaczmar's guilt phase. That included Filancia's testimony. Kaczmar is claiming that counsel should have impeached Filancia's former

testimony by pointing out that Filancia received a 15-year sentence (which is five years under the sentencing cap) as well as the fact that Filancia's completed scoresheet showed a lowest permissible sentence of 65 years in prison.

However, consistent with our analysis above, we see no deficiency in counsel's reliance on the impeachment already included in the transcript, which the second penalty-phase jury heard during the reading of the transcript. That impeachment included the favorable plea deal, prior convictions, and access to Kaczmar's court papers. In our view, further impeachment was not constitutionally required under the facts of this case.

S

Kaczmar contends that trial counsel was ineffective at the 2013 penalty phase for not objecting to the prosecutor's characterization of mitigating evidence as an excuse. We agree with the court's ruling below that Kaczmar cannot show deficient performance.

At the evidentiary hearing, counsel testified that he was aware of the general rule that the prosecutor may not denigrate mitigation. Counsel added that he did not perceive the prosecutor's excuse

statement to be denigrating—either in content, context, or tone. For that reason, counsel declined to object. We conclude that counsel's decision not to object was both reasonable and supported by the record, including counsel's testimony at the evidentiary hearing. *See Sheppard*, 338 So. 3d at 816 (actions attributable to sound trial strategy do not constitute deficient performance). Thus, Kaczmar cannot show deficiency.

T

Kaczmar contends that trial counsel acted unreasonably in not objecting to the court's answer to four jury questions, which were submitted to the court during the 2013 penalty-phase deliberations. We, like the circuit court, see no merit to this argument.

In the middle of deliberations, the jury asked four questions— each requesting information that was not presented in or was not the focus of the second penalty phase. For instance, the jury asked whether there was evidence at the "initial trial" that Kaczmar had (in the days and weeks before the murder) talked about wanting to have sex with Ruiz or treated her in a derogatory fashion. Kaczmar agrees that the court rightly refrained from giving any factually

responsive answers to the jury. Nevertheless, Kaczmar argues that in declining to provide a substantive response to the jury, the circuit court should not have characterized the questions as "not relevant." Kaczmar faults counsel for failing to object to this "not relevant" statement.

We see things differently. It is clear that Kaczmar's jury was required to look solely to the evidence at the 2013 penalty phase in carrying out its function under the death-penalty statute. *Cruz v. State*, 320 So. 3d 695, 725 (Fla. 2021) (finding that it was error for the judge to rely on "nonrecord evidence" from the codefendant's trial); Fla. Std. Jury Instr. (Crim.) 3.10 ("This case must be decided only upon the evidence that you have heard from the testimony of the witnesses [and have seen in the form of the exhibits in evidence] and these instructions." (brackets in original)).

Here, each of the jury's questions necessarily sought at least some evidence beyond what was presented to it. Relatedly, the subject of the questions had no meaningful connection to the sort of evidence that would inform a lawful jury recommendation in this case—i.e., aggravation (which focused on Kaczmar's prior crimes and the manner in which Ruiz's murder was carried out) and

mitigation (which was almost nonexistent).[27]  Bottom line, we do not agree with Kaczmar that the court's response frustrated the jury's ability to properly assess the relevant evidence.  This being the case, we decline to fault counsel for not taking issue with the circuit court's response to the jury.  *Soliz v. Davis*, 750 F. App'x 282, 293 (5th Cir. 2018) ("In order to show that counsel was deficient for failing to object, . . . the objection must have merit." (quoting *Ries v. Quarterman*, 522 F.3d 517, 530 (5th Cir. 2008)).[28]

## U

Kaczmar contends that trial counsel should have ensured that certain preliminary instructions were read to the jury at the start of the 2013 penalty phase.  That failure, Kaczmar tells us, constituted ineffective assistance.  We disagree and affirm the circuit court's rejection of this argument.

---

27.  For instance, one of the questions asked whether the murder weapon was ever found.  An answer to this question, though, does not seem to have any bearing on the aggravation and mitigation which the jury was to assess and which was to inform its recommendation.

28.  We also note that the court's "not relevant" statement described the jury's questions, not any facts or evidence.  Accordingly, Kaczmar misplaces reliance on rules prohibiting courts from commenting on or summing up the evidence.

In his postconviction motion below, Kaczmar faulted counsel for not making sure that all standard preliminary instructions were read to the jury. For example, Kaczmar's jury was not instructed on notetaking or cell phone usage during penalty-phase proceedings. Though these, and other omitted instructions, appear to us to be accurate and useful, we cannot say that every reasonable defense lawyer in trial counsel's position would have insisted that the court give them or object to their omission. *See Jackson*, 347 So. 3d at 304. Consequently, Kaczmar cannot show that his counsel's conduct in relation to these instructions was unreasonable and thus deficient. *See id.*

V

Kaczmar argues that trial counsel was ineffective for failing to request a so-called "presumption of life" instruction. We disagree.

Notably, Kaczmar does not tell us what exactly a presumption of life means or what an instruction on this presumption should look like. To the extent Kaczmar means that a presumption of life has the effect of imposing a burden on the State to prove an aggravating circumstance beyond a reasonable doubt, his jury was already instructed to this effect. If, however, Kaczmar means that

- 65 -

this asserted presumption survives and has force even after the jury finds an aggravating circumstance, then he has failed to provide any support for this principle. In any event, Kaczmar has not cited a single case holding that a jury should have been instructed on the presumption for which Kaczmar now seeks recognition. At a minimum, then, we cannot fault counsel for failing to press an argument that has no precedential support. *See Lynch v. State*, 254 So. 3d 312, 323 (Fla. 2018).

## W

Kaczmar argues that Florida's death-penalty scheme violates the cruel-and-unusual-punishment clauses of the U.S. and Florida Constitutions "because the delay of being executed is especially heinous, atrocious, or cruel." Though it is hard to ascertain what exactly this cryptic argument means, we are confident it lacks merit.

If Kaczmar is claiming that his time on death row—coupled with his eventual execution—is unconstitutional, that claim is plainly inconsistent with our precedent. *See Orme v. State*, 361 So. 3d 842, 845 (Fla. 2023) (collecting cases); *cf. Knight v. Florida,* 120 S. Ct. 459, 461 (1999) (Thomas, J., concurring) (noting uniform

rejection of such claims).

Assuming instead that Kaczmar's claim is based on some sort of estoppel or unclean-hands theory, that claim would be equally unavailing. In his motion, Kaczmar argued that the state-sanctioned killing of a capital defendant by execution necessarily meets the legal criteria of the HAC aggravator and, as a result, amounts to cruel and unusual punishment. Not surprisingly, Kaczmar cites no case in which a court has ever accepted this position, and we decline to be first.

X

Kaczmar argues that the circuit court erred in denying his penalty-phase *Napue* claim, which is based on the same guidelines testimony previously discussed in connection with the guilt-phase *Napue* claim. We agree with the circuit court that this claim does not warrant relief.

Like we did above, we assume the falsity and knowledge prongs. And again, we conclude that Kuritz's testimony was not material. Kuritz was not a key witness at the penalty phase. His testimony had no bearing on the State's evidence of aggravation

- 67 -

(which was compelling). Nor did his testimony operate to diminish the mitigation (which was minimal).

Accordingly, we conclude that the circuit court properly denied Kaczmar's second *Napue* claim.

Y

Kaczmar argues that the cumulative effect of all the errors at his 2013 penalty phase deprived him of a fundamentally fair proceeding. We disagree.

In our analysis above, we assumed deficient performance under *Strickland* in counsel's failure to object to the circuit court's prior-death-sentence statement and also assumed that Kuritz's guidelines testimony was false and that the prosecutor knew of the falsehood—thereby establishing the first two prongs of a *Napue* claim. However, viewing the effects of these two issues in the aggregate, we are still confident that Kaczmar received a fundamentally fair trial. *See Strickland*, 466 U.S. at 696; *Catlin*, 124 F.4th at 742. Put differently, even when considering these issues together, they do not result in the required level of prejudice to support cumulative-error relief. *See Davis*, 383 So. 3d at 761.

IV

Concurrent with his initial brief, Kaczmar filed a habeas petition, which raises six additional claims. We deny them all.

A

Kaczmar makes five claims asserting ineffectiveness of his appellate counsel as a basis for relief. Before addressing each claim, we discuss several applicable background principles.

We have recognized that appellate-ineffectiveness claims are cognizable in a habeas petition. *Jackson,* 347 So. 3d at 308. These claims essentially mirror those asserting trial-level ineffectiveness— meaning the petitioner must demonstrate both deficient performance and prejudice to obtain relief. *Truehill,* 358 So. 3d at 1187.

With respect to the deficiency prong, it is foundational that counsel has no duty to press every conceivable argument that is in some sense supported by the record. *See Valle v. Moore,* 837 So. 2d 905, 908 (Fla. 2002). Nevertheless, we accept that in limited circumstances, appellate counsel can be deficient for failing to raise certain issues in the briefs. *Id.* The omitted issue, though, must be meritorious and "plainly stronger" than the arguments that

appellate counsel actually advanced. *Allen*, 416 So. 3d at 308; *Davila v. Davis*, 582 U.S. 521, 533 (2017). We also stress that scrutiny of counsel's performance in the appellate context remains "highly deferential." *Herrington v. Dotson*, 99 F.4th 705, 720 (4th Cir. 2024). Indeed, courts presume that counsel acted reasonably in selecting the most promising issues to be briefed. *Waters v. Lockett*, 896 F.3d 559, 568 (D.C. Cir. 2018); *cf. United States v. Friedman*, 971 F.3d 700, 709-10 (7th Cir. 2020); ("Tempting as it may be to call foul on every perceived trial error, that strategy generally produces diminishing returns.").

Moreover, a showing of deficient performance does not guarantee relief. Instead, a habeas petitioner must also show prejudice. Paralleling its trial analogue, the prejudice inquiry here focuses on the effect the asserted error had on the outcome of the appellate proceeding. *See Smith*, 330 So. 3d at 889. Accordingly, a habeas petitioner must demonstrate a reasonable probability of a different outcome on appeal, had counsel raised the omitted issue. *See id.* at 890-92. Put differently, if a claim would not have succeeded on direct appeal, there is no prejudice. *See id.*

With these principles laid out, we now assess Kaczmar's

individual claims.

1

Kaczmar begins with the claim that appellate counsel was ineffective for not arguing reversible error in the court's failure to conduct a *Nelson*[29] hearing, which focuses on whether appointed trial counsel has provided competent representation. Prior to trial, Kaczmar sent a letter to the trial court. In that letter, he expressed a "feel[ing]" that counsel was not representing him properly. Kaczmar asserted that counsel (1) lacked specialization in criminal law, (2) had not spoken with certain unnamed witnesses, and (3) had not filed certain unspecified motions.

We do not view these statements as sufficient to trigger the trial court's duty to assess counsel's competence. In a number of cases, we have held that grievances about counsel's strategy and sporadic visitation do not require a *Nelson* inquiry, especially when the defendant has not specifically requested that the judge carry out such an inquiry. *See, e.g., Morrison v. State*, 818 So. 2d 432, 440 (Fla. 2002); *Figueroa-Sanabria v. State*, 366 So. 3d 1035, 1048

---

29. *Nelson v. State*, 274 So. 2d 256, 258 (Fla. 4th DCA 1973).

(Fla. 2023). In our view, Kaczmar's complaints about counsel fall into this category of grievances.[30] Thus, we find that appellate counsel was not deficient for failing to raise a *Nelson* claim on appeal.

2

Kaczmar next faults appellate counsel for not arguing that trial counsel had an actual conflict of interest. We deny this claim.

As best as we can tell from his briefing, Kaczmar asserts that a conflict arose during trial when the State presented evidence of his efforts to incriminate Modlin. Recall, for example, that while in jail, Kaczmar directed an undercover detective (who he thought was "Carlos") to manufacture and plant evidence indicating that Modlin had murdered Ruiz and burned the home. As Kaczmar sees it, counsel needed to blunt the force of this consciousness-of-guilt evidence. To accomplish this, Kaczmar says that counsel should have professed his own incompetence—specifically acknowledging

---

30. We further note that since the defendant did not ask the trial court to conduct a hearing on counsel's competence, reversal on direct appeal could only be based on a finding of fundamental error—an exceedingly demanding standard. *See State v. Dortch*, 317 So. 3d 1074, 1081 (Fla. 2021); *Ritchie v. State*, 344 So. 3d 369, 386 (Fla. 2022).

that Kaczmar's incriminating conduct stemmed from his feelings of desperation, which in turn were due to counsel's poor communication and representation. But instead of accepting responsibility for Kaczmar's desperation, trial counsel opted to preserve his own reputation and thereby put his personal interests ahead of Kaczmar's interests. This claim, however, fails to establish a Sixth Amendment violation.

In order to vacate a conviction in collateral proceedings based on an actual conflict of interest (even where the court had reason to know of the alleged conflict), a defendant must show some adverse effect on the representation due to the conflict. *Mickens v. Taylor*, 535 U.S. 162, 173-74 (2002). This means that Kaczmar has to identify a reasonable strategy that went unused due to the asserted conflict. *See Noe v. United States*, 601 F.3d 784, 790 (8th Cir. 2010) (applying *Mickens*). Per Kaczmar, that unused strategy was a confession of incompetence by counsel in the presence of the jury. However, based on our thorough review of the record, we simply do not believe that such a confession would have been reasonable. Thus, this conflict claim is meritless. And as we have repeatedly indicated, appellate counsel cannot be faulted for failing to raise a

meritless argument. *Hilton v. State*, 326 So. 3d 640, 654-55 (Fla. 2021).

3

Next, Kaczmar argues that appellate counsel should have argued for reversal based on an alleged violation of *Miranda v. Arizona*. We again disagree.

Relying on *Miranda*, counsel moved to suppress statements Kaczmar made during his police interview as well as physical evidence obtained during that interview. The trial court denied the motion, finding no *Miranda* violation. And appellate counsel did not challenge that ruling on appeal. We conclude that counsel's decision to omit this issue was entirely reasonable.

Kaczmar claims that law enforcement continued his interrogation despite his invocation of counsel. However, shortly after Kaczmar claims to have invoked that right (roughly three pages of transcript later), he concededly reinitiated discussions with police. Kaczmar does not highlight any particularly damaging statements made within this short period of time.

Perhaps recognizing the limited value of suppressing any statements made to police within the narrow window of time

discussed above, Kaczmar tells us that these infirm statements somehow led to the seizure of his bloody socks. This logic, however, is inconsistent with case law finding that "*Miranda* errors don't 'require the suppression of the physical fruits of an un-*Mirandized* statement,' so long as the statement was voluntary." *United States v. Lester*, 98 F.4th 768, 775 (6th Cir. 2024) (quoting *Vega v. Tekoh*, 597 U.S. 134, 146 n.3 (2022)). Kaczmar's socks are physical objects, and there is record evidence strongly suggesting voluntariness.

Since there was so little to gain from briefing the *Miranda* issue, we think that objectively reasonable appellate counsel could refrain from doing so. And since any suppression would have had very minimal effects, we conclude that there was also no prejudice.

4

For his next appellate-ineffectiveness claim, Kaczmar asserts that counsel should have argued that the trial court improperly denied his motion for sequestered and individualized voir dire. This meritless claim borders on being frivolous.

Kaczmar fails to identify any binding or well-reasoned authority requiring courts to conduct individual-sequestered voir

dire upon request, nor does he cite any controlling precedent holding that a court abused its discretion in failing to allow such voir dire. Absent such authority, we fail to see how counsel could possibly be deficient, especially in light of the well-accepted principle that counsel cannot be faulted for failing to argue for a change in the law. *See Smith*, 310 So. 3d at 371; *Lynch*, 254 So. 3d at 323.

This analysis is enough to reject this particular ineffectiveness claim. Yet we say a few words about the theory of prejudice that Kaczmar advances in support of it. Recall that prejudice for *Strickland* purposes looks at the probable effect of counsel's act on the outcome of a particular proceeding. 466 U.S. at 693-95. For appellate-ineffectiveness claims like this one, prejudice depends on the outcome of the appeal.[31] Here, though, Kaczmar asserts only future prejudice in the form of procedural barriers that would potentially frustrate his ability to raise a similar claim as part of a

---

31. Had appellate counsel raised this meritless argument, we would have almost certainly rejected it and still affirmed the convictions. Thus, Kaczmar cannot show that the outcome of his appellate process in Florida state court would have been any different had counsel raised this unsupported argument.

prospective federal habeas petition. But a federal habeas proceeding, of course, is not the proceeding whose outcome matters for purposes of this appellate-ineffectiveness claim. *See Dickinson v. Shinn*, 2 F.4th 851, 860 (9th Cir. 2021) (reasoning that loss of a favorable appellate standard of review is not the prejudice required by *Strickland*).

## 5

For his final appellate-ineffectiveness claim, Kaczmar makes an argument very similar to a claim raised in his postconviction motion. Specifically, he argues that appellate counsel was deficient in failing to argue for reversal based on the judge's prior-death-sentence comment. We have already found that trial counsel's failure to object did not prejudice Kaczmar and thus found no basis for relief. We reach a similar conclusion here.

Since counsel did not object to this statement, reversal would only have been possible if the statement constituted fundamental error. *See Ritchie*, 344 So. 3d at 386. For the reasons given above—including the statement's content and briefness as well as the fact that it was not repeated—we find the statement did not amount to fundamental error. *See Teffeteller*, 495 So. 2d at 747;

*Kearse v. State*, 770 So. 2d 1119, 1131 (Fla. 2000); *Lowe v. State*, 259 So. 3d 23, 48 (Fla. 2018).

Accordingly, counsel was not deficient for failing to brief this issue—one that would not have produced a reversal.

In sum, we have considered and denied all of Kaczmar's appellate-ineffectiveness claims. We now address one remaining claim.

B

Kaczmar argues that the State's failure to charge aggravating circumstances in his indictment requires vacatur of his death sentence—even at this post-finality stage. Kaczmar is wrong for two simple reasons.

First, his argument is procedurally barred as it could have been raised on direct review. *See Lott v. State*, 303 So. 3d 165, 166 (Fla. 2020); Fla. R. Crim. P. 3.851(e)(1).[32]

---

32. Our 1983 decision in *State v. Gray*, 435 So. 2d 816 (Fla. 1983), does not command a different conclusion. We acknowledge that *Gray* says in dicta that "the complete failure of an accusatory instrument to charge a crime is a defect that can be raised at any time—before trial, after trial, on appeal, or by habeas corpus." *Id.* at 818. However, to the extent that this statement is in some tension with *Lott*'s procedural-bar holding, we decline to follow *Gray*'s dicta.

And second, we have consistently held that aggravating factors need not be listed in the indictment. *Wolf v. State*, 416 So. 3d 1117, 1137 (Fla. 2025) (collecting cases). We add that Kaczmar's invocation of our state constitution—specifically, the indictment clause—does not alter our analysis.

Accordingly, this claim lacks merit, just like the other five before it.

V

In sum, none of Kaczmar's postconviction claims—whether in his motion or petition—support relief. Accordingly, we affirm the circuit court's order in all respects, except as to the claim on which it granted relief. As to that claim, including the grant of a new penalty phase, we reverse. Lastly, we deny Kaczmar's habeas petition in its entirety. On remand, the circuit court shall reinstate Kaczmar's death sentence.

It is so ordered.

MUÑIZ, C.J., and COURIEL, FRANCIS, and SASSO, JJ., concur.
LABARGA, J., dissents with an opinion.
TANENBAUM, J., did not participate.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., dissenting.

Kaczmar was indicted on charges of first-degree murder, attempted sexual battery, and arson. The jury found him guilty of all charges and ultimately recommended the death penalty by a vote of 11 to 1. Majority op. at 7. This Court affirmed Kaczmar's conviction for first-degree murder but reversed the death sentence and remanded the case for a new penalty phase. *Kaczmar v. State,* 104 So. 3d 990, 1008 (Fla. 2012). On remand, the resentencing court sentenced Kaczmar to death after the penalty phase jury unanimously recommended the death penalty. This Court affirmed the death sentence. *Kaczmar v. State,* 228 So. 3d 1 (Fla. 2017).

Thereafter, Kaczmar filed a motion for rehearing, arguing for the first time that he was entitled to a new penalty phase because the resentencing judge informed the entire group of prospective jurors that Kaczmar had been previously sentenced "to death in this case." *Kaczmar v. State,* 42 Fla. L. Weekly S851, S851 (Fla. Oct. 19, 2017) (unreported order). Without reaching the merits, this Court denied the motion for rehearing without prejudice, permitting Kaczmar to challenge the statement in a separate proceeding. *Id.* Notably, two justices would have granted rehearing based on the

resentencing judge's improper comment. *Id.* at S851-52 (Pariente, J., dissenting); *id.* at S852 (Quince, J. dissenting). The circuit court, after considering Kaczmar's motion in a separate proceeding as suggested by this Court, granted his postconviction motion and vacated his death sentence, having found that Kaczmar was prejudiced by defense counsel's failure to object to the resentencing judge's prejudicial statement.

Today, the circuit court's findings and sound reasoning notwithstanding, the majority concludes that Kaczmar cannot establish a *Strickland* violation because he was not prejudiced by the resentencing judge's improper statement. I dissent.

In *Hitchcock v. State*, 673 So. 2d 859 (Fla. 1996), like in this case, the trial court on remand improperly informed the jury the defendant had previously been sentenced to death:

> First of all, this case is back before you for consideration because a jury previously recommended that James Ernest Hitchcock be sentenced to death for this crime. However, the death sentence was overturned because of an incomplete jury instruction rendered to the previous jury.

*Id.* at 863.

This Court remanded Hitchcock's resentencing on other grounds but addressed the trial court's improper statement "to provide guidance in the next resentencing" and to avoid "preconditioning the present jury to a death recommendation." *Id.* In doing so, this Court unequivocally instructed the trial court that "[n]o other instruction [but the following] is to be given by the court as to a prior jury's penalty-phase verdict or why the case is before the jury for resentencing at this time":

> An appellate court has reviewed and affirmed the defendant's conviction for the murder of [the victim]. However, the appellate court sent the case back to this court with instructions that the defendant is to have a new trial at this time to decide what sentence should be imposed.

*Id.* Furthermore, in a note to judges, this Court later approved a jury instruction using the above language suggested in *Hitchcock* nearly verbatim:

> Give 1a at the beginning of penalty proceedings before a jury that did not try the issue of guilt. <u>Give bracketed language if the case has been remanded by the supreme court for a new penalty proceeding.  See *Hitchcock v. State*, 21 Florida Law Weekly S139 (1996)</u>.  In addition, give the jury other appropriate general instructions.
>
> > 1.a.  Ladies and gentlemen of the jury, the defendant has been found guilty of <u>Murder in the First Degree.</u> [An appellate court has reviewed and affirmed the

defendant's conviction.  However, the appellate court sent the case back to this court with instructions that the defendant is to have a new trial to decide what sentence should be imposed.]  Consequently, you will not concern yourselves with the question of [his] [her] guilt.

*Standard Jury Instructions in Crim. Cases No. 96-1*, 690 So. 2d 1263, 1264 (Fla. 1997) (brackets and emphasis in original).

Notwithstanding the guidance offered by this Court in *Hitchcock*, and a jury instruction providing the acceptable language to be presented to the jury, the resentencing judge inexplicably gave the following off-the-cuff explanation to the panel of prospective jurors in Kaczmar's new penalty phase proceeding:

> This case has a little history to it so let me explain your duty today.  It's different than most trials we ever have.
>
> The defendant was found guilty of murder in the first degree on 8/12/2010, sentenced on 11/5/10 to life—to death in this case.  Anyway, the Supreme Court always reviews any type of death case so the case went to the state Supreme Court, Florida State Supreme Court. They affirmed his conviction, that is they confirmed his conviction for the first degree murder.  However, the Supreme Court sent the case back here with instructions that the defendant is to have a new trial to decide what sentence should be imposed.

*Kaczmar*, 42 Fla. L. Weekly at S851-52 (Pariente, J., dissenting).

Thus, the prospective jurors were advised that Kaczmar was sentenced "to death in this case" on November 5, 2010, and that "the Supreme Court sent the case back here with instructions that the defendant is to have a new trial to decide what sentence should be imposed." *Id.* at S851. As a direct result of this disclosure, the actual jurors seated for Kaczmar's new penalty phase, who were responsible for rendering a recommendation of life imprisonment or death, instantly learned that a judge had previously sentenced Kaczmar to death in this case.

In my view, given the prejudice caused by the resentencing judge's revelation, the circuit court properly found that Kaczmar was prejudiced by defense counsel's failure to object to the resentencing judge's statement and properly ordered a new penalty phase. Defense counsel should have objected as soon as the statement was made and requested the court excuse the entire panel of prospective jurors and start again with a new panel—the common practice when the entire panel has been tainted.

Moreover, the trial court's statement was "clear reversible error" and the failure to raise the issue before the rehearing

constitutes "ineffective assistance of appellate counsel that is apparent on the face of the record." *Id.* (citations omitted).

While acknowledging that *Hitchcock* "generally forbids telling a resentencing jury that the defendant was previously sentenced to death," majority op. at 17, the majority nonetheless concludes that Kaczmar cannot establish a *Strickland* violation because he was not prejudiced by the court's statement. *Id.* at 14, 21-22. I strongly disagree.

First, the majority concludes that the statement itself was not as prejudicial as Kaczmar claims. *Id.* at 18. The majority presumes that because the circuit court ordered a new penalty phase, "the jury knew that the prior sentence was no longer valid, and it had no reason to regard the vacated sentence as somehow deserving continued respect or deference." *Id.* This is contrary to the reasoning in *Hitchcock*, where this Court cautioned that "*[m]aking the present jury aware* that a prior jury recommended death and reemphasizing this fact as the trial judge did here *could have the effect of preconditioning the present jury to a death recommendation.*" *Hitchcock*, 673 So. 2d at 863 (emphasis added).

Second, the majority "underscore[s] that the judge instructed the jury to consider only the *evidence* it received at the penalty-phase hearing in determining the proper sentencing recommendation." Majority op. at 19. Because "no evidence of Kaczmar's prior sentence was introduced at the penalty phase," the majority argues that "we may presume that the jury followed that instruction and based its sentencing verdict on the penalty-phase evidence alone, not an isolated statement uttered prior to jury selection." *Id.* However, I could not disagree more strongly with the characterization of the judge's comment as just "an isolated statement." *Id.* Moreover, the timing of the statement during jury selection—as opposed to during the presentation of evidence—does not mitigate the prejudice. In fact, the harm is even more blatant because the jury was aware of the prior death sentence *throughout* the new penalty phase. Indeed, according to *Hitchcock*, it is a resentencing jury's *awareness of a prior death sentence* that may precondition the jurors to recommend death. 673 So. 2d at 863. The instruction to consider only evidence did not remedy the prejudicial effect the statement had because the jury remained aware of Kaczmar's prior death sentence as it heard the evidence,

considered the evidence, and rendered its sentencing recommendation. This is not to suggest that the jury felt bound by the prior death sentence. Rather, the danger is the jury's sheer awareness of the prior sentence as it contemplated Kaczmar's penalty. In a situation of this magnitude, that is enough to satisfy the prejudice requirement under *Strickland*.

Third, the majority further reasons that the statement's brevity and lack of clarity diminish its prejudicial effect. Majority op. at 18-19. However, the statement framed the penalty phase proceedings and purported to explain the jurors' duty in the new proceedings. The fact that the court jumbled its words and engaged in minor self-correction in delivering the statement does not diminish its prejudicial effect. Simply put, the resentencing jury heard the statement and thus became aware that Kaczmar had previously been sentenced to death in the case. This awareness, according to *Hitchcock*, is exactly what may precondition a jury to recommend death.

At the outset of Kaczmar's resentencing, the jurors became aware that Kaczmar had previously been sentenced to death in the case they were about to consider. Additionally, as the resentencing

proceedings progressed, the jury undoubtedly deduced that the previous death sentence imposed by the trial judge was preceded by a death recommendation from a jury. Given the magnitude of this information, it is highly likely that the jury was preconditioned to recommend death—the prejudice *Hitchcock* sought to avoid. It is therefore inconceivable that Kaczmar failed to satisfy the *Strickland* prejudice standard. The prejudice here is insurmountable and the only remedy is a retrial of the penalty phase.

I would affirm the findings and conclusions of the circuit court and remand the case for a new penalty phase.

An Appeal from the Circuit Court in and for Clay County,
    Michael S. Sharrit, Judge
    Case No. 102009CF000233000AMX

James Uthmeier, Attorney General, and Jason W. Rodriguez, Senior Assistant Attorney General, Tallahassee, Florida,

    for Appellant/Cross-Appellee/Respondent

Dawn B. Macready, Capital Collateral Regional Counsel, and Elizabeth Spiaggi, Assistant Capital Collateral Regional Counsel, Northern Region, Tallahassee, Florida,

    for Appellee/Cross-Appellant/Petitioner